IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTOPHER HARVEY HARE,

   *Plaintiff*,

   v.                                                     Civil Action No. ELH-11-3488

NIK RICHIE, *et al.*,

   *Defendants*.

## MEMORANDUM OPINION

Christopher Harvey Hare, the self-represented plaintiff, has sued several defendants regarding derogatory remarks about him that were posted on a website with the domain name "thedirty.com." *See* Complaint (ECF 1).[1] Now pending are motions to dismiss filed by two of the defendants: Dirty World, LLC ("Dirty World"), the business entity that owns and operates thedirty.com; and iNetwork Group, LLC ("iNetwork"), a business entity that has provided financing to Dirty World. Both Dirty World and iNetwork seek dismissal pursuant Fed. R. Civ. P. 12(b)(2), for lack of personal jurisdiction, and Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief can be granted. The motions have been fully briefed,[2] and the Court now rules pursuant to Local Rule 105.6, no hearing being necessary. For the reasons that follow, Dirty World's motion will be denied, and iNetwork's motion will be granted.

---

[1] Because plaintiff is proceeding without counsel, his filings have been "'liberally construed'" and are "'held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citation omitted).

[2] In connection with Dirty World's motion, I have considered the motion ("Dirty Motion") (ECF 17), plaintiff's opposition ("Dirty Opp.") (ECF 19), and Dirty World's reply ("Dirty Reply") (ECF 22). In connection with iNetwork's motion, I have considered the motion ("iNetwork Motion") (ECF 33), plaintiff's opposition ("iNetwork Opp.") (ECF 35), and iNetwork's reply ("iNetwork Reply") (ECF 36).

### Factual and Procedural Background[3]

Plaintiff is a "finance professional in the Baltimore, Maryland area."  Complaint at 3 ¶ 1.[4] He is also a decorated veteran of the Maryland Air National Guard.  *Id.* ¶ 2.  He avers that he enjoys "a stellar reputation among his friends, family, and acquaintances, and was highly regarded by the Baltimore, MD community."  *Id.* ¶ 3.

Dirty World is a Delaware limited liability company with its principal place of business in Phoenix, Arizona.  *See* Ex.1 to Dirty Motion ¶ 3 (ECF 17 at 19).  Dirty World owns and operates thedirty.com.  *Id.* ¶ 4.  The parties have not explicitly described the nature of the website, but the submissions and exhibits make clear that thedirty.com provides an online platform for readers to post content and to comment on content submitted by other readers.  The site's editor, Nik Richie, adds his own comments to the posts.  Mr. Richie is one of the defendants in this lawsuit.  However, he has not yet been served with process or appeared.

In the site's own words, its subject matter is "intel, opinions, gossip, satire, and celebrities."  *See, e.g.*, Ex.1 to Dirty Opp. at 1 (ECF 19-1).  This understanding comports with descriptions of thedirty.com given by other federal courts.  *See, e.g., Jones v. Dirty World Entertainment Recordings, LLC*, 766 F.Supp.2d 828, 830 (E.D. Ky. 2011) ("Defendant Dirty World, LLC operates…an Internet web site known as 'thedirty.com.'…This web site invites and

---

[3] In considering a motion to dismiss under Rule 12(b)(6), a court must construe the facts alleged in the complaint in the light most favorable to the plaintiff, as the party opposing the motion.  *See Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  The same is true of a motion to dismiss under Rule 12(b)(2) when, as here, the court rules without conducting an evidentiary hearing.  *See Carefirst of Md., Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

[4] In his complaint, plaintiff restarted the numbering of paragraphs in each section.  Thus, the complaint contains, for instance, eleven paragraphs that are denominated as paragraph 1.  Accordingly, when citing to the complaint, I have included both the page and paragraph number.

publishes comments by individuals who visit the site, and defendant Hooman Karamian, a/k/a Nik Richie ('Richie'), responds to those posts and publishes his own comments on the subjects under discussion.") (Citations omitted); *Gauck v. Karamian*, 805 F.Supp.2d 495, 497 (W.D. Tenn. 2011) ("Defendants…own and operate the website TheDirty.com.  Founded in 2007 by current editor-in-chief Richie, the site provides a forum for users to 'submit dirt' on themselves and others, which can include news, photos, video or text, and to comment on material submitted by others.") (Citations omitted).

As the complaint alleges, the content on thedirty.com is divided into sections based on geographic location.  *See* Ex.1 to Dirty Opp. (ECF 19-1).  Most of the sections correspond to major U.S. cities, including Baltimore, but a handful are named after major cities in other countries, such as Paris and Montreal.  *Id.*  All of the posts at issue here were posted in the "Baltimore" section.

On July 11, 2011, a post appeared on the website under the caption "Chris Hare The Baltimore Stalker."  *Id.*  Hare has appended a copy of the post, as well as comments left by users of the website, as Exhibit A to his complaint.  *See* ECF 1-2.  Plaintiff avers that the post contains "copyrighted images of him."  Complaint at 4 ¶ 6.  The post contains several photographs, purportedly of plaintiff, although the printout provided to the Court by plaintiff is not clear enough to decipher.  The text of the post states:

> Nik, I just wanted to warn all the women of Baltimore to beware of Chris Hare. He acts normal around his friends but he's actually a disgusting stalker who causes drama and stalks girls kids [sic] at their schools.  People need to know who this loser is and to be wary of him.  He got knocked out cold at Riverwatch after terrorizing a couple who he's been stalking for years.  Put this Loser on blast for the good of all women in Baltimore!  Thanks Nik.  Luv Ya!

ECF 1-2 at 1.  An apparent editorial comment to the post, purportedly from Richie (unlike user-submitted comments, it is contained in the body of the post, in bold type), states, *id.*: "Wow, he really looks like a stand up guy.  −nik." *Id.*

There are seventy nine user comments attached to the post, some of which contain derogatory remarks about Hare.  For example, a user named "Christina" wrote: "OMG!  I know this guy.  Yikes!" *Id*. at 2.  A user named "Scared for women in Baltimore" wrote, *id.*:

> This guy works at Tiki Barge and has been posting crazy Stalker messages all over facebook.  Wake up people!  This guy is a total psychopath and will hurt someone one day.  he [sic] is not teh [sic] victim here he terrorizes people and loves to cause drama to get attention.  People who claim to be his friend and are on his side will have blood on THEIR hands!  Remember that!

Other commenters rose to Hare's defense.  For example, a user named "littlemary" wrote, *id.*: "I think the world of Chris.  He is a genuinely good guy.  Shame on jealous people that want to make trouble!" *Id.* at 3.  And, some of the posts were apparently submitted by Hare (the user names attached to the comments are "Christopher H. Hare" and "Chris Hare") and lob insults at and threaten legal action against those posting unfavorable content.  For example, "Chris Hare" referred to detractors as "LOSER[s]" and "JERSEY Shore Hags" and wrote: "My LEGAL team is 'pissed off' . . . cause [sic] they are 'FAIR Fighters' LIKE me ! [sic]" *Id.* at 4.

Hare was featured in a second post on thedirty.com on September 6, 2011.  Complaint at 5 ¶ 6.  The post is captioned "Glass Jaw Douchebag," and allegedly contains two "copyrighted images" of Hare.  A copy of the post, as well as comments left about the post by users of the website, is appended to the complaint as Exhibit B.  *See* ECF 1-5.  The post reads as follows, *id.*:

> Nik, I don't know this Clown's name but my boy knocked him out with 1 punch a few weeks ago.  He had been talking mad sh*t [sic] about my buddy's girl and wouldn't leave them alone out a bar [sic] and got dropped.  Since then he's been crying on here and posting bullsh*t [sic] showing what a little b*tch [sic] he is.  I

was only in town for the weekend but after hearing about this I had to put this Clown on blast!

An editorial comment to the post, purportedly from Richie, states, *id*.: "Trouts needa [sic] watch their mouth [sic], they think their wallet protects them.  –nik."[5]  And, there are 51 user comments attached to the post, most of which are critical of Hare.  There are no comments from users "Christopher H. Hare" or "Chris Hare."

Hare appeared in a third post on thedirty.com on September 21, 2011.  Complaint at 5 ¶ 6.  A copy of the post, as well as comments about the post left by users of the website, is appended to the complaint as Exhibit C.  *See* ECF 1-6.  The post is captioned "Baltimore Stalker Looking For A Date," and reads, *id*:

> Nik, this Baltimore Stalker is joining dating websites looking for new victims.  Word is this pathetic 50 year old schlub is posing as different guys on dating websites offering free trips to Aruba to get girls.  Don't be fooled.  He is impotent and only wants women so he can take pictures of them and pleasure himself alone since he's afraid of actual female contact.  What a sad pathetic Greg [sic].

Again, there is an editorial comment to the post, purportedly from Richie, which states, *id*.: "He's trying to prove to himself he's not gay.  –nik."  There are 21 user comments mocking Hare.  *Id*.  But, there are no comments from users "Christopher H. Hare" or "Chris Hare."

A fourth post featuring Hare appeared on thedirty.com on September 29, 2011.  Complaint at 6 ¶ 6.   *Id.*  A copy of the post, as well as comments left about the post by users of the website, is appended to the complaint as Exhibit D.  *See* ECF 1-7.  Again, Hare avers that the

---

[5] The parties' submissions do not clarify the meaning of the term "trout" in this context.  But, it appears that "trout" can be used as a slang term referring to older men who seek the company of younger women.  *See* Urban Dictionary (definition of "trout"), *available at* http://www.urbandictionary.com/define.php?term=trout (last visited Aug. 28, 2012) ("A man who likes to date younger women (i.e. he swims downstream in age); Antonym = salmon (a guy who likes to date older women, or swims upstream in age).").

post contains copyrighted images of him.  The post contains an image, apparently of Hare, seated on a motorcycle and extending his middle finger to the camera.  The post is captioned "Baltimore Stalker Response To 'Jealous' Fans" and reads, *id.*:

> Hey Nik, here's my RESPONSE to my Baltimore "Jealous" Fans [sic].  The GREGS and LILLYS[6] like "Baltimore STALKING" my PICS ! [sic]  I'm a VETERAN on THE Dirty….. [sic] Yours TRULY, The Baltimore Stalker.

Although the post was written from the supposed point of view of plaintiff, it does not appear that plaintiff submitted the post himself.  An editorial comment to the post, purportedly from Richie, states: "I like your socks. –nik." *Id.*[7]

There are nineteen user comments on the post.  One is from a user named "Chris," who stated, *id.*:

> This whole thing is SAD…..!  * [sic] I wanted PEACE always, BUT your [sic] NOT going to LIE to me or about me anymore.  I deserve fairness, honesty, and respect.  ONE day you will figure it out, without the help of LIARS trying to cover their ass, or PIGS getting you DRUNK.  I'm really SORRY it got to this point, BUT I'm a FIGHTER for TRUTH ! * [sic]

In addition, plaintiff has filed a "supplement" to his complaint, adding Exhibit K (ECF 26-1), which is a purported posting on thedirty.com about Mr. Hare, dated January 26, 2012, allegedly containing copyrighted photographs of him.  The posting, titled "Bug Eyed Candyman On The Prowl," states, *id.*:

> Nik, this loser is on your site, bashing girls and pretending to be a Navy Seal all of the time.  I was told to delete him from facebook by a few local girls but he is such a trainwreck [sic] that I just can't.  He is so drugged out of his mind posting

---

[6] The meaning of "Gregs and Lillys" is unclear, but the phrase appears to refer to commenters on the previous posts about Hare.

[7] Hare's socks are white in color and are visible in the picture.  A subsequent comment submitted by a user named "Fashion Police" perhaps casts further light on Mr. Richie's comment.  "Fashion Police" stated: "Black *skinny* jeans (1987) and black *sneakers* (1994) with WHITE socks.  No wonder this 'MORON' can't get a date.  LOL."  ECF 1-7 at 2.

crazy rants that you can't help but laugh at him and his pathetic life.  I had to share these pics so everyone could have a good laugh.  How many lines does it take to make that face?

Mr. Richie's editorial comment states: "I wouldn't know but it couldn't be too many, this 30k[8] couldn't afford a lot.  –nik."  *Id.*

In his complaint, Hare insists that he "is not a public figure," but was "specifically targeted for slander, libel, and defamation of his character."  *Id.* at 6 ¶¶ 7-8.  He insists that defendants "committed conspiracy…to destroy Mr. Chris Hare reputation [sic] in the Baltimore, Maryland community."  *Id.* at 7 ¶ 9.  Hare observes that the site published its own comments on each of the four posts at issue, "the tenor of which…agreed with the libelous postings…."  *Id.* ¶ 12.  Moreover, he maintains that defendants "accepted and maintained" the posts "even after Mr. Chris Hare provided proof that all claims about Mr. Chris Hare were false,"[9] knowing that "the libelous comments would have a devastating impact on Mr. Chris Hare and invade his right to privacy and potential loss of future employment."  *Id.* ¶¶ 13-14.

In support of his assertions about the "devastating impact" of the posts, Hare notes that "Chris Hare The Baltimore Stalker" is "the #1 one [sic] search result under GOOGLE search engine for the search of 'Chris Hare Baltimore.'"  *Id.* ¶ 15.  As Exhibit A-1 to the complaint, *see*

---

[8] The meaning of "30k" is unclear.  Perhaps it is shorthand for the term "30k millionaire," which is apparently a slang term meaning "[s]omeone that spends money beyond their means," or (more colorfully) "a person, usually a guy, who makes around 30k a year, usually from working at a window tinting shop, loan office, or an occupation that does not by any means require a college degree. With his pitiful . . . income, he spends it all on bottles of champagne at clubs, a boat, a nice car, and sometimes a 3-day trip to Vegas, only to be left with nothing in his account by overdraft fees and possibly a pending loan."  Urban Dictionary (definition of "30k millionaire"), *available at* http://www.urbandictionary.com/define.php?term=30k (last visited Aug. 28, 2012).

[9] Plaintiff does not explain what "proof" he submitted to demonstrate that the claims were false.

- 7 -

ECF 1-3, plaintiff has appended a screenshot, or photographic capture, of the Google.com search results for that phrase, and it comports with his assertions.   And, plaintiff avers that, upon information and belief, the "webpages containing the defamatory content" have "had thousands of hits," many of which "were from Internet users in the Baltimore Maryland [sic] area." Complaint at 10 ¶ 17.

Hare claims that he "emailed the defendants many times beginning on July 15, 2011," requesting the removal of the offending content.   *Id.* at 8 ¶ 15.   *Id.*[10]   He avers that, "[a]s of December 1, 2011, none of the 4 POSTS or Comments defaming Mr. Chris Hare have . . . been removed."

Accordingly, plaintiff brought this suit, asserting nine counts: "Defamation" (Count I); "Invasion of Privacy – False Light" (Count II); "Misappropriation of Name and Likeness" (Count III); "Statutory Misappropriation of Name, Photographs, and Likeness" (Count IV); "Intentional Infliction of Emotional Distress" (Count V); "Invasion of Privacy – Intrusion upon Seclusion and Publicity Given to Private Life" (Count VI); "Civil Conspiracy" (Count VII); "Veil Piercing and Vicarious Liability" (Count VIII); and "Injunctive Relief" (Count IX).[11]

In his complaint, plaintiff named nine defendants: Nik Richie ("a/k/a Corbin Grimes, a/k/a Hooman Karamian"); Dirty World; the website www.thedirty.com; another related website, www.thedirtyarmy.com; Dirty, Inc.; The Dirty, LLC; Dirty World Entertainment, LLC; Dirty

---

[10] Plaintiff has submitted several of these emails in Exhibit A-2 to the complaint.  *See* ECF 1-4.   However, the content of the emails is not relevant to resolution of the pending motions.

[11] In addition, the complaint includes allegations that defendants displayed copyrighted works without permission, although Mr. Hare does not expressly assert any claims under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*

Entertainment, LLC; and Dirty Scottsdale, LLC.[12]  Subsequently, plaintiff voluntarily dismissed The Dirty, LLC (it was an unrelated party that happened to have a similar name to the other defendants).  *See* ECF 20, ECF 21.  Plaintiff also added iNetwork as a defendant, after Dirty World disclosed the financial relationship between Dirty World and iNetwork in Dirty World's motion to dismiss.[13]  *See* ECF 20, ECF 21.  In addition, plaintiff advised that he did not object to dismissal of his claims against www.thedirtyarmy.com; Dirty, Inc.; Dirty World Entertainment, LLC; Dirty Entertainment, LLC; and Dirty Scottsdale, LLC, after service on those entities could not be completed within the 120-day period established by Fed. R. Civ. P. 4(m).  *See* ECF 24.  Accordingly, the claims against those entities were dismissed.  *See* ECF 25.  Thus, Dirty World, iNetwork, Mr. Richie, and www.thedirty.com are the only remaining defendants.

Plaintiff seeks to enjoin defendants from using his name, image or likeness on thedirty.com, as well as compensatory damages in the amount of fifty million dollars, punitive damages, treble damages, costs and attorney fees, and "a constructive trust…on all revenue generated by the defamatory material posted on 'thedirty.com.'"  Complaint at 22-23.

Additional facts will be included in the Discussion.

---

[12] The manner in which plaintiff's complaint was captioned seems to indicate that Dirty World, LLC and www.thedirty.com were only named as "doing business as" identities of Mr. Richie.  *See* Complaint at 1.  However, Mr. Hare later submitted a "Motion to Separate Defendants" (ECF 8), clarifying that Dirty World and www.thedirty.com were intended to be defendants in their own right.  That motion was construed as an amendment to the complaint and was granted.  *See* ECF 11.

It is not clear that the websites themselves (thedirty.com and thedirtyarmy.com) are entities that are capable of being sued.  However, neither website has appeared in this case (although service has been accepted on behalf of www.thedirty.com), and to date the issue of the websites' legal capacity has not been raised by any of the parties.

[13] The financial relationship will be discussed in more detail, *infra*.

**Discussion**

A.  Standards of Review

As noted, Dirty World and iNetwork have moved to dismiss for lack of personal jurisdiction and for failure to state a claim.  "When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence."  *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).  Discovery and an evidentiary hearing are not required to resolve a motion under Rule 12(b)(2).  *See generally* 5B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1351, at 274-313 (3d ed. 2004, 2012 Supp.).  Rather, the district court may address the question of personal jurisdiction as a preliminary matter, ruling solely on the basis of motion papers, supporting legal memoranda, affidavits, and the allegations in the complaint.  *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009).  In that circumstance, the plaintiff need only make "a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge."  *Id.*

"In deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff."  *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.,* 334 F.3d 390, 396 (4th Cir. 2003).  However, "'[a] threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'"  *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 n.5 (4th Cir. 2005) (citation omitted).

Similarly, when deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (quoting *Erickson v. Pardus,* 551 U.S. 89, 94 (2007), and *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)). The court may properly consider documents "attached or incorporated into the complaint," as well as documents attached to the motion to dismiss, "so long as they are integral to the complaint and authentic." *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also E.I. du Pont de Nemours & Co.*, 637 F.3d at 448. Accordingly, the website postings at issue in this case are proper subjects of consideration under Rule 12(b)(6).

Whether a complaint states a claim for relief is judged by reference to the pleading requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure. Rule 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56 n.3 (2007) (citation omitted). To be sure, the plaintiff need not include "detailed factual allegations in order to satisfy" Rule 8(a)(2). *Id.* at 555. But, the rule demands more than bald accusations or mere speculation. *Id.* To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556. A complaint that provides no more than "labels and

conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient under the Rule. *Id.* at 555.

A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6). *German v. Fox*, 267 F. App'x 231, 233 (4th Cir. 2008). Both *Twombly*, 550 U.S. 544, and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), make clear that, in order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions'..." (citation omitted)); *see Simmons v. United Mortgage and Loan Inv.*, 634 F.3d 754, 768 (4th Cir. 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

However, in resolving a Rule 12(b)(6) motion, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S. Ct. 1740 (2010). Moreover, a motion pursuant to Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted). But, if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "'the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citation omitted).

### B.  Dirty World's Motion

Dirty World contends that it is not subject to personal jurisdiction in this Court and, in the alternative, that it is immune from liability in this case pursuant to a provision of the federal Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1).   At this juncture, I am not persuaded that either contention has merit.

#### 1.  Personal Jurisdiction

Rule 4(k)(1) of the Federal Rules of Civil Procedure authorizes a federal district court to exercise personal jurisdiction over a defendant in accordance with the law of the state where the district court is located.   *Carefirst*, *supra*, 334 F.3d at 396.   Therefore, "to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment."   *Id.*

Maryland's long-arm statute is codified at Md. Code (2006 Repl. Vol., 2011 Supp.), § 6-103(b) of the Courts & Judicial Proceedings Article ("C.J.").   It authorizes "personal jurisdiction over a person, who directly or by an agent," *inter alia*, "[t]ransacts any business or performs any character of work or service in the State," C. J. § 6-103(b)(1); "[c]auses tortious injury in the State by an act or omission in the State," C.J. § 6-103(b)(3); or "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State." C.J. § 6-103(b)(4).

Maryland's courts have "consistently held that the purview of [Maryland's] long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." *Beyond Systems, Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 15, 878 A.2d 567, 576 (2005) (citing *Mohamed v. Michael*, 279 Md. 653, 657, 370 A.2d 551, 553 (1977)). "Because the limits of Maryland's statutory authorization for the exercise of personal jurisdiction are coterminous with the limits of the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996); *accord ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002). Thus, the constitutional due process inquiry is paramount.

The United States Supreme Court has long held that personal jurisdiction over a non-resident defendant is constitutionally permissible so long as the defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Courts have separated this test into individual "prongs," first ascertaining whether the threshold of "minimum contacts" is met, and then considering whether the exercise of jurisdiction on the basis of those contacts is "constitutionally reasonable." *ALS Scan*, 293 F.3d at 712; *see Consulting Engineers, supra*, 561 F.3d at 278-79.

The "minimum contacts" test is met where the defendant has "purposefully avail[ed] himself of the privilege of conducting business under the laws of the forum state." *Consulting Engineers*, 561 F.3d at 278. A determination that the defendant has established minimum contacts with the forum state amounts to a conclusion that "'it is presumptively not unreasonable

to require him to submit to the burdens of litigation in that forum as well.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). Generally, the court must consider the prong of constitutional reasonableness "[i]f, and only if" the minimum contacts test is met. *Consulting Engineers*, 561 F.3d at 278. The constitutional reasonableness inquiry permits a defendant "who purposefully has directed his activities at forum residents" to defeat jurisdiction, if he can "present a compelling case that the presence of some other considerations would render jurisdiction unconstitutional." *Burger King*, 471 U.S. at 477.

Due process jurisprudence recognizes "two types of personal jurisdiction: general and specific." *CFA Institute v. Institute of Chartered Financial Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009). The difference between the two types of jurisdiction turns on the amount and nature of the contacts with the forum state that are necessary to meet the "minimum contacts" threshold. The Fourth Circuit has explained:

> General personal jurisdiction, on the one hand, requires 'continuous and systematic' contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred. Specific personal jurisdiction, on the other hand, requires only that the relevant conduct have such a connection with the forum state that it is fair for the defendant to defend itself in that state.

*Id.* (citing, *inter alia*, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984)) (internal citations omitted). In other words, "the threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction." *ALS Scan*, 293 F.3d at 715 (internal quotation marks omitted); *accord Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005).

Dirty World asserts that it is not subject to general personal jurisdiction in Maryland, because the complaint does not "contain any facts showing that [Dirty World] is enaged in any

'continuous, systematic, and fairly extensive contacts with Maryland' as required to establish general jurisdiction…."   Dirty Motion at 5 (citation omitted).   In addition, Dirty World has submitted the affidavit of James Grdina, a manager of Dirty World's financial affairs, who avers that Dirty World "does not change its advertising to target any specific market," Defendant's Exhibit A, ¶ 7, "Dirty World is not "authorized to conduct business in Maryland," *id.* ¶ 9; has no "offices in Maryland," *id.* ¶ 10; has no "customers in Maryland," *id.* ¶ 11, has "no contractual relationship with any vendors in Maryland," *id.* ¶ 12; has no "advertisements from any Maryland-based business," *id.* ¶ 13; and that Richie "has never been to Maryland and has never performed any business in Maryland on behalf of [Dirty World]."   Affidavit of James Grdina ("Grdina Aff.") ¶¶ 7-14, Ex.A to Dirty Motion (ECF 17 at 18-20).

I am inclined to agree with Dirty World that it is not subject to general personal jurisdiction in Maryland.  I need not resolve that issue definitively, however, because I am amply persuaded that Dirty World is subject to specific personal jurisdiction in Maryland, based on the alleged activity that forms the basis of plaintiff's claims in this case.

The model for analysis of specific personal jurisdiction in the context of the Internet was articulated in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).  The Fourth Circuit substantially adopted the *Zippo* analysis in its 2002 decision in *ALS Scan*.  *See ALS Scan*, *supra*, 293 F.3d at 714 ("adopting and adapting the *Zippo* model").  The *Zippo* analysis places Internet-related contacts on a "sliding scale" that distinguishes between passive and interactive websites.  *Zippo*, 952 F. Supp. at 1124.  Exercise of personal jurisdiction is improper over passive, non-interactive websites that merely post information.  In contrast, jurisdiction is proper where websites have ongoing transactions with customers in the forum

state, such as when they "enter[] into contracts with residents of a foreign jurisdiction . . ." *Id.*

In the middle of this scale are "interactive Web sites where a user can exchange information with

the host computer . . . [and] the exercise of jurisdiction is determined by examining the level of

interactivity and commercial nature of the exchange of information that occurs on the Web site."

*Id.*

In *ALS Scan*, the Fourth Circuit summarized its adaptation of the *Zippo* model as a three-

part test:

> [A] State may, consistent with due process, exercise judicial power over a person
> outside of the State when that person (1) directs electronic activity into the State,
> (2) with the manifested intent of engaging in business or other interactions within
> the State, and (3) that activity creates, in a person within the State, a potential
> cause of action cognizable in the State's courts.

*ALS Scan*, 293 F.3d at 714;[14] *accord Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers,*

*Inc.*, 334 F.3d 390, 399 (4th Cir. 2003).

Under the *Zippo* standard, as elucidated in *ALS Scan* and its progeny, a foreign defendant

"must have done something more than merely place information on the Internet" in order to be

subject to jurisdiction in the forum state. *Carefirst*, 334 F.3d at 400. The Fourth Circuit's

decision in *Young v. New Haven Advocate*, 315 F.3d 256, 264 (4th Cir. 2002), is instructive.

---

[14] The *ALS Scan* Court noted that this standard is "not dissimilar" to the "effects test"
articulated in *Calder v. Jones*, 465 U.S. 783 (1984). *ALS Scan*, 293 F.3d at 714; *accord
Carefirst*, 334 F.3d at 398-99. The effects test requires the plaintiff to establish:

> (1) [T]he defendant committed an intentional tort; (2) the plaintiff felt the brunt of
> the harm in the forum, such that the forum can be said to be the focal point of the
> harm; and (3) the defendant expressly aimed his tortious conduct at the forum,
> such that the forum can be said to be the focal point of the tortious activity.

*Carefirst*, 334 F.3d at 398 n.7 (citation omitted).

In *Young*, a Virginia prison warden sued a Connecticut newspaper for publishing defamatory material about him on the newspaper's website, which was accessible to Virginia residents. *Id.* at 261-62. The Fourth Circuit distinguished the warden's argument for personal jurisdiction from another libel case, *Calder v. Jones*, 465 U.S. 783 (1984), by noting that in *Calder*, the "writers' actions were expressly aimed at California," while in the case before it, the focus of the Connecticut newspaper's website and articles was "decidedly local"—the communication was targeted to a Connecticut audience. *Young*, 315 F.3d at 262-63. In support of this, the Court observed that the website was devoted to serving Connecticut markets and readers, noting that it "provides access to local (Connecticut) weather and traffic . . . and links to websites for the University of Connecticut and Connecticut state government." *Id.* at 263. The *Young* Court also examined the content of the articles that referenced Virginia and the warden (the plaintiff) "to determine whether they were posted on the Internet with the intent to target a Virginia audience." *Id.* Although the articles mentioned the Virginia warden, the articles focused on Connecticut prisoner transfers and "encouraged a public debate in Connecticut" on that policy. *Id.* at 264. Thus, the key factor in deciding that Virginia lacked personal jurisdiction over the Connecticut newspaper was that the newspaper's Internet activities did not "manifest an intent to target and focus on Virginia readers." *Id.* at 263. This contrasted with the newspaper defendant in *Calder*, 465 U.S. at 789-90, in which the Supreme Court stated that the defendant's "actions were expressly aimed at [the forum state]," the defendant "knew that the brunt of that injury would be felt by [the plaintiff] in the State in which she lives and works," and thus the Court determined that the exercise of personal jurisdiction was permissible.

Dirty World argues that, although thedirty.com "is certainly *visible* to Maryland residents, it is also visible in every other state in the United States.  This fact alone cannot support jurisdiction in Maryland."  Dirty Motion at 9 (emphasis in original) (citing *Young,* 315 F. 3d at 263).  Dirty World concedes that it "occasionally advertises and offers products for sale on its website (t-shirts, hats, etc.)," which can be purchased by Maryland residents.  *Id.*  But, it maintains that "Mr. Hare's claims do not arise from any advertising or business transaction between himself and [Dirty World], nor do his claims arise from [Dirty World's] business transaction with any other Maryland resident."  *Id.*

Mr. Hare acknowledges that "merely having a presence on the internet of a website is not sufficient contacts to 'subject [Defendants] to personal jurisdiction in each State in which the information is accessed.'"  Dirty Opp. at 3 (quoting *ALS Scan*, 293 F. 3d at 713) (plaintiff's alteration).   But, he insists that thedirty.com "can and indeed must be categorized" as intentionally interacting with the residents of Maryland.  Opposition at 3-4.  In support of this assertion, Hare notes that, "[o]n the main gateway portal page (home page) of www.thedirty.com, the first menu option a website user is presented with is [a list of] 'Cities,'" which includes Baltimore.  Dirty Opp. at 4.  Mr. Hare also notes that Mr. Richie "write[s], publish[es] and broadcast[s]" his editorial comments on each post, which plaintiff characterizes as "defamatory material about residents of Baltimore, Maryland."  *Id.* Moreover, as plaintiff sees it, Mr. Richie, acting on behalf of Dirty World, "engage[s] in dialogue with the posters, the majority of whom are from the same locations that the subjects of their postings are from."  *Id.*

In my view, Dirty World fits squarely within the middle of the *Zippo* scale.  To be sure, the bulk of thedirty.com's online activity does not consist of business transactions with Maryland

residents, nor is that the activity at issue in this case.  But, Dirty World does not "simply place[ ] information on the Internet."  *ALS Scan*, 293 F.3d at 714.  Rather, it invites users to "'Submit Dirt.'"  Dirty Opp. at 4 (quoting Ex.2 to Dirty Opp. (ECF 19-2) (submission page on thedirty.com)).  Because Dirty World does not rest at either end of the *Zippo* spectrum, assessment of jurisdiction is determined by "examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site."  *ALS Scan*, 293 F.3d at 714 (quoting *Zippo*, 952 F. Supp. at 1124) (internal quotation marks omitted).

This assessment determines whether Dirty World "direct[ed] electronic activity into [Maryland]," with the "manifested intent of engaging in business or other interactions within [Maryland]," and whether "that activity creates, in a person within [Maryland], a potential cause of action cognizable in [Maryland's] courts."  *Id.*  Unlike the website at issue in *Young*, thedirty.com is not targeted to an audience that is local to an area outside the forum state.  Rather, thedirty.com targets a national and even an international audience.  More important, Dirty World's website specifically directs electronic activity toward Maryland through the "Baltimore" section of its website, where all of the content at issue is posted.  Indeed, as Mr. Grdina points out in his affidavit, *see* Grdina Aff. ¶ 5, when a user submits a post, thedirty.com permits the user to select the geographic section of the website in which to place the content.  This demonstrates an intent to direct the content to users in that geographic area.

Moreover, Dirty World manifested an intent to engage in interactions within Maryland by adding its own commentary to posts directed to Baltimore.  Like the publisher at issue in *Calder*, Dirty World must have known that the primary effects of the posts at issue would be felt in

Maryland, because they were posted in the Baltimore section and concerned Maryland residents and events.

Mr. Grdina emphasizes that thedirty.com does not tailor its advertisements to a geographic area, as all advertisements are "intended for a nationwide audience."  Grdina Aff. ¶ 7.  Although targeting advertisements to Maryland might demonstrate an intent to engage in business with Marylanders, the failure to target advertising geographically is not dispositive. The fact that Dirty World does not target its advertisements does not preclude jurisdiction if it engages with Marylanders in other ways.  *See Zippo*, 952 F. Supp. at 1126 (personal jurisdiction where defendant entered into contracts with forum state residents in addition to advertising there).   Here, the allegedly defamatory content at issue is itself targeted to a Maryland readership.

In sum, this is not a case where personal jurisdiction is based solely on the posting of information on a website that happens to be accessible in Maryland.  Rather, this case involves information posted on a website that specifically targets a Maryland audience.  In the words of *ALS Scan*, Dirty World "directs electronic activity into the State" of Maryland, and does so "with the manifested intent of engaging in business or other interactions within the State," thus satisfying the first two prongs of the adapted *Zippo* analysis.  *ALS Scan*, 293 F.3d at 714. Moreover, the third prong is also satisfied, because the electronic activity that forms the basis of the jurisdictional contacts also forms the basis of Dirty World's alleged liability: the activity "creates, in a person within the State, a potential cause of action cognizable in the State's courts."  *Id.*   For the foregoing reasons, I conclude that Dirty World possesses the requisite minimum contacts with Maryland to constitute purposeful availment.

With minimum contacts established, I must consider whether the exercise of jurisdiction over Dirty World is "constitutionally reasonable." *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 216 (4th Cir. 2001) (internal quotation marks omitted); *accord CFA Inst.*, 551 F.3d at 296.  In other words, I must consider whether litigation in this forum is "'so gravely difficult and inconvenient' as to place the defendant at a 'severe disadvantage in comparison to his opponent.'" *CFA Inst.*, 551 F.3d at 296 (quoting *Burger King*, 471 U.S. at 476) (internal citations omitted).  Drawing on Supreme Court case law, the Fourth Circuit has identified several factors that are relevant to the constitutional reasonableness inquiry, including the following:

> (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies.

*Consulting Engineers*, *supra*, 561 F.3d at 279.

Dirty World has advanced no argument with respect to the constitutional reasonableness prong, and I find it satisfied.  Although Dirty World's principal place of business is in Arizona, Dirty World has made no showing that it would be particularly burdensome for Dirty World to appear in court in Maryland.  Unlike the plaintiff, Dirty World has secured counsel to represent its interests, and its litigation burden is thus "no more substantial than that encountered by other entities that choose to" interact with Maryland residents.  *CFA Inst.*, 551 F.3d at 296.  Moreover, Dirty World "is not shielded from civil liability in [Maryland] because it is headquartered in [Arizona]." *Id.*  By posting and adding comments to submissions from Maryland residents about events occurring in Maryland, and by creating a specific "Baltimore" category, Dirty World

could have reasonably foreseen that a Maryland resident might initiate a lawsuit in Maryland. *See id.* (stating that a corporation repeatedly reaching into a forum to transact business should reasonably expect a lawsuit in that forum).   The difficulty that Dirty World may face in defending a lawsuit in Maryland does not rise to the level of a deprivation of due process.   *See Calder*, 465 U.S. at 790 ("An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California."); *accord CFA Inst.*, 551 F.3d at 296.

Second, Maryland has a "valid interest in the resolution of the grievances of its citizens and businesses, particularly when they potentially involve issues of" Maryland law.   *CFA Inst.*, 551 F.3d at 297; *see Lee v. Walworth Valve Co.*, 482 F.2d 297, 299 (4th Cir.1973) (recognizing forum state's "paternal interest in the recovery by one of its citizens of appropriate compensation, if there is a substantive cause of action"); *see also McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) (same); *cf. Fed. Ins. Co. v. Lake Shore, Inc.*, 886 F.2d 654, 661 (4th Cir. 1989) (weighing plaintiffs' non-forum-state residency as a factor *against* recognizing jurisdiction).   As a result, Maryland's interests favor the court's exercise of personal jurisdiction over Dirty World.   *CFA Inst.*, 551 F.3d at 297.

The third factor, concerning the plaintiff's interest in obtaining relief, does not weigh strongly in favor of exercising personal jurisdiction, as plaintiff could, if he chose, sue Dirty World in its home state.   However, this factor does not counsel against exercising jurisdiction in Maryland, nor does it outweigh the other two factors, which strongly support the exercise of personal jurisdiction here.   Moreover, the fourth and fifth factors identified in *Consulting*

*Engineers* are also neutral.  As such, maintenance of suit against Dirty World in Maryland is not constitutionally unreasonable.

The foregoing analysis is in accord with another recent district court decision in a similar case, in which the court found it had personal jurisdiction over Dirty World as a foreign defendant on the basis of similar allegedly defamatory communications.  *See Jones v. Dirty World Entm't Recordings, LLC*, 766 F. Supp. 2d 828, 836 (E.D. Ky. 2011).[15]   Therefore, I decline to dismiss the claims against Dirty World for lack of personal jurisdiction.

### *2.  Communications Decency Act Immunity*

In addition, Dirty World argues that it is entitled to immunity under the Communications Decency Act.  The provision at issue, 47 U.S.C. § 230(c)(1), states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."   The statute also contains a provision confirming that it provides a defense to claims under state law.  *See* 47 U.S.C. § 230(e)(3) (stating, in relevant part: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

The terms "interactive computer service" and "information content provider" are defined in § 230(f)(2)-(3):

---

[15] In a section of its reply entitled "Prefatory Remarks," Dirty World observes that "Mr. Hare has copied his pleading essentially *verbatim* from a brief filed in" the *Jones* litigation.  This certainly explains some aspects of Hare's briefing that would otherwise seem odd, such as his frequent citation of cases from Kentucky and the Sixth Circuit, as opposed to Maryland and the Fourth Circuit.  Although it might have been better for Mr. Hare to have attributed his arguments to their sources, I am mindful of the leniency afforded to self-represented litigants such as Mr. Hare, and I disagree with Dirty World that the Opposition is "non-responsive to any of the points set forth in Dirty World's motion."  *Id.* at 4.

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

*   *   *

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

In *Nemet Chevrolet v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (internal citations omitted), the Fourth Circuit summarized the import of § 230(c)(1) and its associated definitions:

> Taken together, these provisions bar state-law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties. Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them. State-law plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online.

The circuits are split as to whether the defense established by § 230(c)(1) is properly understood as an "immunity" defense. *Compare, e.g., Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) (holding that § 230(c)(1) establishes an immunity defense); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (same) *with City of Chicago v. StubHub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010) (holding that § 230(c)(1) does not create an immunity); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009) (same). However, the Fourth Circuit is among the courts that "clearly view[ ] the § 230 provision as an immunity." *Nemet Chevrolet*, 591 F.3d at 254 n.4 (citing *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)). Ordinarily, courts "aim to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from 'ultimate liability,' but also from 'having

- 25 -

to fight costly and protracted legal battles.'"  *Nemet Chevrolet*, 591 F.3d at 255 (citation omitted).

It is well settled that website operators "are providers of interactive computer services." *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007); *see Nemet Chevrolet*, 591 F.3d at 255 (defendant website operator was "an interactive computer service provider under the CDA."); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) (undisputed that message board website operator was a provider of interactive computer services).  There is no dispute in this case that thedirty.com is an "interactive computer service" and that Dirty World is its "provider" within the meaning of § 230(c)(1).

Indeed, the "prototypical service qualifying for this statutory immunity [under § 230(c)(1)] is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others."  *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009).  In *Accusearch*, the Tenth Circuit illuminated the history of § 230(c)(1):

> Congress enacted the CDA in response to a state-court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710, *5 (N.Y. Sup. Ct. May 24, 1995), which held that the provider of an online messaging board could be liable for defamatory statements posted by third-party users of the board.  The *Stratton Oakmont* court ruled that the administrator of the board became a "publisher" when it deleted some distasteful third-party postings, and thus was subject to publisher's liability for the defamatory postings it failed to remove.  The decision was criticized for discouraging the voluntary filtration of Internet content, because a forum provider's efforts to sanitize content would trigger liability that could be avoided by doing nothing.

*Id.* (some internal citations omitted).

"In passing section 230, Congress sought to spare interactive computer services this grim choice by allowing them to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or

delete." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1165 (9th Cir. 2008) (en banc). Thus, "'Congress decided not to treat providers of interactive computer services like other information providers such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing or distributing obscene or defamatory material written or prepared by others.'" *Batzel v. Smith*, 333 F.3d 1018, 1026 (9th Cir. 2003) (quoting *Blumenthal v. Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998)). As the Fourth Circuit explained in its touchstone decision in *Zeran v. America Online, Inc.*, *supra*, 129 F.3d at 330: "§ 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." It is "immaterial whether this decision comes in the form of deciding what to publish in the first place or what to remove among the published material." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 n.8 (9th Cir. 2009). Moreover, "an editor's minor changes to the spelling, grammar, and length of third-party content do not strip him of section 230 immunity." *Fair Housing Council*, 521 F.3d at 1170.

Nevertheless, § 230(c)(1) "was not meant to create a lawless no-man's-land on the Internet." *Id.* at 1164. In the words of the statute, if the information on which liability is based was not "provided by *another* information content provider," an interactive computer service provider will not be entitled to immunity under § 230(c)(1) (emphasis added). *See Nemet Chevrolet*, 591 F.3d at 254. The Ninth Circuit explained in *Fair Housing Council*, 521 F.3d at 1162-63:

> A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a

service provider with respect to that content.  But as to content that it creates itself, or is "responsible, in whole or in part" for creating or developing, the website is also a content provider.  Thus, a website may be immune from liability for some of the content it displays to the public but be subject to liability for other content.

In this case, whether Dirty World is entitled to immunity under § 230(c)(1) turns on whether it is an information content provider with respect to the allegedly defamatory communications at issue.

In Dirty World's view, it is a provider of an interactive computer service, Dirty Motion at 11-12; it did not *itself* "actually *create*[ ] any of the defamatory or otherwise unlawful material," *id.* at 12 (emphasis in original); and plaintiff "seeks to impose liability on [Dirty World] for 'publishing' the allegedly defamatory/unlawful posts…." *Id*. at 13-14.  It posits: "Nothing more is required to conclude that [Dirty World] is entitled to immunity under the CDA." *Id.* at 14.  In Dirty World's view, its failure to remove "the offensive posts after receiving notice that they were allegedly false" is "irrelevant to the question of CDA immunity," *id.* at 13, as is the "allegation that 'defendants *agreed* with the libelous postings….'" *Id.* at 14 (quoting Complaint at 7 ¶ 12) (Dirty World's emphasis).

In contrast, plaintiff insists that "Defendants are not merely the owner/operator of an interactive computer service," nor "merely the publisher of defamatory material."  Dirty Opp. at 9.  Rather, plaintiff asserts, "Defendants are, in fact, through the writings of Nik Richie the authors of said defamatory material in the Complaint." *Id*.  According to Hare, to immunize defendant under such circumstances would mean that "in effect,…any author of defamatory material can attack others with impunity and without consequence, and then may hide behind the immunity offered by the CDA…." *Id*. at 9-10.  Further, plaintiff argues that, even as an

owner/operator of an interactive computer service, defendant is not entitled to CDA immunity because thedirty.com "'specifically encourages development of what is offensive about the content.'"  *Id.* at 10-11 (quoting *Accusearch*, *supra*, 570 F.3d at 1199).  Plaintiff contends: "The entire nature of www.thedirty.com is to encourage the development of such defamatory material."  Dirty Opp. at 11.

At this juncture, it is undisputed that the five postings at issue were not authored by Mr. Richie.  Rather, he selected them for publication.  If Dirty World's involvement with the postings were limited to the decision whether to publish user-supplied content, it would clearly be entitled to immunity under § 230(c)(1).   However, Dirty World's involvement goes beyond mere editorial functions and extends to the creation of its own content—specifically, Mr. Richie's comments at the end of each post.

Under Maryland law,[16] "'[a] defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person.'"  *Norman v. Borison*, 418 Md. 630, 645 n.10 (2011) (citation omitted).  The tort of defamation consists of four elements: "'(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm.'"   *Id.*   (citations omitted).   Some of Mr. Richie's remarks, though undoubtedly derogatory, are not actionable as defamation.  Statements such as ""Wow, he really looks like a stand up guy," and "I like your socks," are obviously sarcastic, and are not meant to be compliments.   Nevertheless, "the Supreme Court has recognized that if a statement is not

---

[16] The parties have not addressed the choice of substantive law that is applicable.   In using Maryland law to illustrate a point, the Court makes no ruling as to choice of law.

provable as false or is not reasonably interpretable as stating facts, then it cannot form the basis of a defamation suit." *Thacker v. City of Hyattsville*, 135 Md. App. 268, 313 762 A.2d 172, 196 (2000) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)).

However, Dirty World has chosen not to brief the substantive question of whether Mr. Richie's statements are defamatory.  Although I will not resolve whether they are defamatory in the absence of briefing, it is clear that several of Mr. Richie's statements are at least closer to the line.  A fact finder might construe as defamatory statements such as ""Trouts needa [sic] watch their mouth [sic], they think their wallet protects them," and "He's trying to prove to himself he's not gay."[17]

In any event, if Dirty World is the creator or developer, in whole or in part, of the content at issue, it is not entitled to immunity under § 230(c)(1) as to that content.  To be sure, Dirty World contends that it is not responsible for the actions of Nik Richie.   Dirty Reply at 3.  However, "Section 230 does not preclude joint liability for the joint development of content." *Blumenthal v. Drudge*, 992 F. Supp. 44, 50 (D.D.C. 1998).  If Dirty World were merely a passive provider of Mr. Richie's material, then Dirty World's argument might have some weight.  But, Richie is the founder and editor-in-chief of thedirty.com.  Moreover, "a corporation can only act through its agents." *Western Md. Wireless Connection v. Zini*, 601 F. Supp. 2d 634, 643 (D. Md. 2009).  At this stage of the litigation at least, when reasonable factual inferences must be resolved in the plaintiff's favor, I must conclude that Richie was acting on behalf of Dirty World in authoring his comments.  This distinguishes Dirty World from *Blumenthal*, 992 F. Supp. at 50,

---

[17] The parties  have not briefed the issue of whether the fact that a statement is composed in slang, which may not be readily comprehensible to many readers, affects whether the statement can be considered defamatory.   I reiterate that, at this juncture, I must take all reasonable inferences from the facts in plaintiff's favor.

where a publisher had immunity under the CDA for distributing a gossip column because there was no support for the allegation that the publisher "had some role in writing or editing the material."

This is not to say that Dirty World created or developed all of the material on its website. The posts themselves were created by users of the site, and the users' comments, other than those of Mr. Richie, presumably were not authored by agents of Dirty World.  In general, § 230(c)(1) shields website operators from liability for comments posted by third-party users.  *See, e.g.*, *Nemet Chevrolet*, 591 F.3d at 258 (holding website not liable for third party content); *DiMeo v. Max*, 248 F. App'x 280, 281 (3d Cir. 2007) (holding website message board not liable for third party comment); *Zeran*, 129 F.3d at 331 (same).

Nevertheless, some courts have recognized that a website operator may be "responsible" for "development" of offensive content, within the meaning of § 230(c)(1), if it "in some way specifically encourages development of what is offensive about the content."  *Accusearch*, 570 F.3d at 1199.  *See also Johnson*, *supra*, 614 F.3d at 792 (holding interactive computer service provider was entitled to § 230(c)(1) immunity where there was "no evidence that [provider] designed its website to be a portal for defamatory material or do anything to induce defamatory postings"); *Fair Housing Council*, 521 F.3d at 1164-65 (holding website operator was not entitled to § 230(c)(1) where it made users' "answering . . . discriminatory questions a condition of doing business," thereby participating in the "development" of the users' submissions).

Courts are divided as to what rises to the level of "development" in the context of a gossip website such as thedirty.com.   Indeed, courts have reached different conclusions regarding thedirty.com itself in cases similar to the one at bar.   In *Jones v. Dirty World*

*Entertainment Recordings, LLC*, 840 F. Supp. 2d 1008, 1012 (E.D. Ky. 2012), the court held that, "by reason of the very name of the site, the manner in which it is managed, and the personal comments of defendant Richie, the defendants have specifically encouraged development of what is offensive about the content of the site," and therefore was not entitled to immunity under § 230(c)(1).

In contrast, in *S.C. v. Dirty World, LLC*, No. 11-CV-392-DW, 2012 WL 3335284 (W.D. Mo. Mar. 12, 2012), the court held that "merely encouraging defamatory posts is not sufficient to defeat CDA immunity." *Id.*,  2012 WL 3335284, at *4.[18]  *See also DiMeo v. Max*, 433 F. Supp. 2d 523, 530-31 (E.D. Pa. 2006) (holding that Tucker Max, the proprietor of a website chronicling his efforts to "'be a celebrity that gets paid to get drunk, act like an asshole, and get drunk some more," and hosting message boards containing allegedly defamatory material about plaintiff, was entitled to § 230(c)(1) immunity), *aff'd*, 248 F. App'x 280, 281 (3d Cir. 2007).  *Cf. Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929, 933 (D. Ariz. 2008) (holding that operator of consumer review website entitled "Ripoff Report" was entitled to § 230(c)(1) immunity and stating that, although it was "obvious that a website entitled Ripoff Report encourages the publication of defamatory content," there was "no authority for the proposition that this makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site.").

---

[18]  However, the *S.C.* Court expressly distinguished *Jones* on its facts, because Mr. Richie's only editorial comment appended to the single allegedly defamatory posting in *S.C.* was "'[h]er gumlines [sic] as big as her teeth, that's amazing,'" 2012 WL 3335284, at *1, which the *S.C.* Court characterized as "an opinion about the Plaintiff's appearance that did not relate to the alleged defamatory statements" in the post.  *Id.*, 2012 WL 3335284, at *5.  As noted, Mr. Richie's comments in this case at least arguably go further.

As noted, the appellate case law regarding § 230(c)(1) contemplates that a website operator may be deprived of immunity if it "designed its website to be a portal for defamatory material." *Johnson*, 614 F.3d at 792.   At this point, however, I need not resolve the debate between the *Jones* and *S.C.* courts and determine whether Dirty World participates in the "development" of third-party material on its website to the extent that it is stripped of § 230(c)(1) immunity for the third-party material.  Dirty World clearly is not entitled to immunity as to Mr. Richie's own commentary, and so this case must proceed to discovery.  Discovery will allow the creation of a factual record that will provide a better foundation for the Court to rule on the issue of whether Dirty World "designed its website to be a portal for defamatory material." *Johnson*, 614 F.3d at 792, or "specifically encourages development of what is offensive about the content" submitted by third parties to its website, *Accusearch*, 570 F.3d at 1199, so as to lose the protection of § 230(c)(1) for user-submitted content by participating in the content's development.

I am mindful of the Fourth Circuit's admonition that § 230(c)(1) immunity should be resolved at an early opportunity.   Nevertheless, "a court is entitled to have before it a proper record, sufficiently developed through discovery proceedings, to accurately assess any claim, including one of immunity.  And even a party whose assertion of immunity ultimately proves worthy must submit to the burdens of litigation until a court becomes sufficiently informed to rule." *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 220 (4th Cir. 2012) (en banc).

Accordingly, Dirty World's motion to dismiss will be denied.  Of course, Dirty World will be free to raise the issue of § 230(c)(1) immunity again, as to user-created posts and commentary, in a motion for summary judgment during or after the completion of discovery.

Dirty World will also be free to address in such a motion the issue of whether, in fact, Mr.

Richie's comments expose Dirty World to liability for defamation as a substantive matter.

### C.  iNetwork's Motion

iNetwork also moves to dismiss on the basis of lack of personal jurisdiction and failure to

state a claim.  Mr. Hare added iNetwork as a defendant in this case on the basis of the affidavit of

James Grdina, which was submitted as an exhibit to Dirty World's motion to dismiss.  Mr.

Grdina is the Manager of iNetwork.  He averred that iNetwork "has provided financing" to Dirty

World since September 2009, and that, since that time, Mr. Grdina has "been actively involved

in managing the financial affairs and operations" of Dirty World, being "personally involved in

all financial aspects of [Dirty World's] business operations, advertising sales, product sales, and

marketing efforts." ECF 17 at 18-19. Under penalty of perjury, and on the basis of personal

knowledge, Mr. Grdina attested to a variety of aspects of Dirty World's business practices.

In its motion, iNetwork has submitted a Supplemental Affidavit of Mr. Grdina ("Grdina

Supp. Aff.") (ECF 33 at 17-32), in which Mr. Grdina asserts that iNetwork is a Delaware LLC

with its sole place of business in Phoenix, Arizona, and that he is the sole member of iNetwork.

Grdina Supp. Aff. ¶ 4.  According to Mr. Grdina, iNetwork loaned $625,000 to Dirty World in

September 2009.     *Id.* ¶ 5.   The documents establishing and memorializing the loan were

"executed in Arizona, called for the application of Arizona law, required payments to be made in

Arizona, and resulted in a perfected UCC-1 filing statement being filed with the Arizona

Secretary of State."  *Id.*   Thereafter, Dirty World began "experiencing substantial financial

problems," and Grdina took it upon himself to begin "overseeing Dirty World's financial

operations and some of its business operations including its advertising sales, product sales, and

marketing efforts," in order to protect his investment. *Id.* ¶ 6. However, Mr. Grdina asserts that neither he nor iNetwork has ever had any role in the creation of content on thedirty.com (including the posts at issue in this lawsuit). *Id.* ¶¶ 7-8, 13. Indeed, Mr. Grdina has never met Mr. Hare and his only knowledge of Mr. Hare came from reading the pleadings in this matter. *Id.* ¶ 9. Further, Mr. Grdina avers, *id.* ¶¶ 10-12:

> Except for the loan that it made to Dirty World in 2009, iNetwork does not transact any business of any kind outside of Arizona.

> iNetwork has no customers other than Dirty World, and iNetwork has never engaged in any business of any kind in the State of Maryland.

> iNetwork does not have a website of its own, nor does iNetwork market itself in any way to any persons or businesses outside of Arizona.

On this basis, iNetwork argues that it is not subject to personal jurisdiction in Maryland, nor could it be liable to Mr. Hare as a substantive matter. Moreover, iNetwork observes that, even if Mr. Hare's complaint were liberally construed to assert a claim against Mr. Grdina personally, Mr. Grdina filed for personal bankruptcy on June 1, 2012, and any claims against him would be subject to the automatic stay under 11 U.S.C. § 362(a). *See* iNetwork Motion at 5; Grdina Supp. Aff. ¶ 14; *In re Grdina*, Bankr. Case No. 2:12-bk-12301 (Bankr. D. Ariz.).

In his opposition to iNetwork's motion, Mr. Hare does not respond directly to iNetwork's factual assertions and legal arguments, other than to insist that Mr. Grdina's managing and funding of Dirty World is a sufficient basis to exercise personal jurisdiction over iNetwork and impute liability to it on the basis of a theory of civil conspiracy. *See* iNetwork Opp. at 1-2.

I need not reiterate the principles regarding personal jurisdiction set forth above. Based on the undisputed facts attested by Mr. Grdina, it is clear that this Court lacks either general or specific personal jurisdiction over iNetwork.

To be sure, "those who support and authorize funding of intentional tortious conduct must be subject to personal jurisdiction in the state where the tort took place and where they committed the acts that supported the tort." *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1101 (10th Cir. 2009). Nevertheless, where one business organization (iNetwork) has provided general funding to another business organization (Dirty World), without in any way designating the funding for the purpose of Dirty World's alleged tortious conduct in the forum state, or having any direct involvement in that allegedly tortious conduct, the Court cannot conclude that iNetwork has "purposefully avail[ed] [it]self of the privilege of conducting business under the laws of the forum state." *Consulting Engineers*, *supra*, 561 F.3d at 278.

Accordingly, I will dismiss plaintiff's claims against iNetwork for lack of personal jurisdiction.[19]

### D. Status of Claims Against Nik Richie

In addition to Dirty World and iNetwork, plaintiff has sued Mr. Richie. Service has not yet been effected on him. Because plaintiff is proceeding *in forma pauperis*, attempts at service have been made by the United States Marshals Service. *See* 28 U.S.C. § 1915(d) (providing that the "officers of the court shall issue and serve all process" in *in forma pauperis* cases). Based on address information provided by Mr. Hare, the Marshals Service has twice attempted to serve

---

[19] Even if this Court had personal jurisdiction over iNetwork, I would conclude that plaintiff fails to state a claim against iNetwork upon which relief can be granted. He has articulated no facts to support his bald allegation of a conspiracy between iNetwork and Dirty World, and his attempt to impute Dirty World's alleged liability to its funders would fly in the face of well settled principles of limited liability that apply to business entities such as Dirty World and iNetwork, both of which are limited liability companies.

Mr. Richie by certified mail at 14442 N. 100th Way, Scottsdale, AZ 85260.  *See* ECF 16 at 3, 5; ECF 32 at 2.[20]  However, the certified mailings have been returned as undeliverable.

Parties have "a duty to avoid unnecessary expenses of serving the summons."  Fed. R. Civ. P. 4(d)(1).  Accordingly, in the Order that accompanies this Memorandum Opinion, counsel for Dirty World is instructed to advise the Court whether he is authorized to accept service on behalf of Mr. Richie.  If counsel is so authorized, Mr. Richie may file his response to plaintiff's complaint within 60 days after entry of this Order, consistent with the provisions for waiver of service contained in Fed. R. Civ. P. 4(d).  If counsel is not authorized to accept service, the Court will entertain a motion from Mr. Hare for preliminary discovery from Dirty World for the disclosure of contact information as to Mr. Richie for the purpose of effecting service.  *See generally Shriner v. Annapolis City Police Dept.*, Civ. No. ELH-11-2633, 2012 WL 959380 (D. Md. Mar. 19, 2012).

An Order consistent with the foregoing rulings follows.

Date:   August 29, 2012                              _____/s/_____
                                                     Ellen Lipton Hollander
                                                     United States District Judge

---

[20] ECF 32 was docketed as a return of service as to www.thedirty.com, although it contains the returned certified mailing to Mr. Richie.  The Marshals Service may have transposed the certified mailing numbers for Mr. Richie's summons and the summons for thedirty.com.  *Compare* ECF 32 *with* ECF 29 (docketed as returns of service as to Mr. Richie and iNetwork, but in actuality containing the certified mail records as to thedirty.com and iNetwork).